IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHIZOBA CHRISTOPHER UZOH )
)
Petitioner )
) Case No. 11-cv-09124
v. )
) Suzanne B. Conlon, Judge
CHIDINMA AKACHI UZOH )
)
Respondent. )
)
)

## DECISION ON THE MERITS

### Introduction

This case centers on two young children who live in the United States without the consent of their father, a Nigerian national who resides and practices medicine in England.[1] The children are in the custody of their mother, a Nigerian national who resided with her husband in England until May 9, 2011. The mother has overstayed her tourist visa to the United States; her visa expired on November 9, 2011 and she is subject to deportation. However, she filed an asylum claim after deciding not to return to the family home in England. Her asylum request was initially denied on December 8, 2011, with the statement,

> After careful consideration of all available information and explanations at your asylum interview, your claim was deemed not credible of the basis of: Material inconsistency(ies) within your testimony.

---

[1] For convenience, petitioner Chizoba Christopher Uzoh is referred to as "the father," and respondent Chidinma Akachi Uzoh is identified as "the mother." The parties' trial exhibits are referred to as either "Pet. Ex." or "Resp. Ex."

1

Pet. Ex. 19.[2] The mother's present legal residency is far from settled.

The father petitions this court for an order returning his children to the United Kingdom pursuant to The Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.* The United States and the United Kingdom are signatories to the Hague Convention. The father claims that the mother has illegally retained and concealed their children in the United States, in contravention of his parental rights under English law. *See* Pet. Ex. 17 (under English law, the parents have a joint parental responsibility for minor children, including the right to custody).

On December 27, 2011, this court granted the father's request for a rule to show cause ordering the mother to appear before the court with the children. The mother complied with the order and appeared before the court with counsel and the children on January 23, 2012. She complied with the court's orders to surrender the children's United States passports to the clerk of the court and not to remove the children from this jurisdiction pending resolution of this dispute.

A three-day bench trial was held and the case was taken under advisement. The Hague Convention mandates the court to promptly decide whether to order the return of the children to the United Kingdom. Hague Convention, arts. 7, 11. This decision on the merits incorporates the court's findings of fact and conclusions of law, as required by Fed. R. Civ. P. 52.

---

[2] This was apparently a preliminary rejection; the notice also stated: **This is not a denial of your asylum application.** *Id.* (emphasis in original). A removal hearing is set on April 4, 2013. Pet. Ex. 20. The notice states the mother is a native and citizen of Nigeria who has remained in the United States "without authorization." *Id.* The court infers that the mother is subject to deportation to Nigeria.

2

## Findings of Fact and Conclusions of Law

The mother and father are husband and wife. Both are Nigerian nationals. They were married in Nigeria in 2008, but their marital home was in Bristol, England, where the father practiced medicine with the National Health Service and the mother worked for a victims' rights organization.

Before the birth of their first child on August 31, 2009, the father arranged for the mother to fly from England to Denver, Colorado, where their daughter was born. The mother and infant stayed with the father's sister. On October 22, 2009, the mother returned to the family home in England with their daughter in accordance with the couple's plans. The agreed purpose for the trip was to provide the child with the benefits of United States citizenship.

Family life resumed in England. In time, a second child was expected. The couple agreed to follow the same plan for the birth to take place in Denver in order to secure United States citizenship for the new baby. The father purchased round trip tickets, and again the father's sister was to host the wife and their children. The mother traveled from England to Denver on May 9, 2011, accompanied by their daughter. The couple's second child, a son, was born on June 25, 2011.

The father expected his wife and children to return within several months of the baby's birth. There were cordial communications between the parents immediately after the baby's birth. The father repeatedly inquired as to when his family would return home. The couple's relationship turned sour on July 27, 2011, when the mother informed the father she was in no hurry to return to England with the children. The father responded with a series of emails, evidencing his anger and frustration. The early emails implored the mother to return with the

children, and to at least "make sure you return my kids." *E.g.,* Pet. Ex. 18. At the same time, he threatened to cancel the credit card he had given her if she did not come home. *Id.* She did not respond. Three days later, he cancelled the credit card because, as he later told his father-in-law, she threatened him with not returning to the United Kingdom with their children. Resp. Ex. 7.

On August 9, 2011, the mother abruptly left her sister-in-law's Denver home with the children. She did not inform the father or her sister-in-law where she was taking the children. The father's reaction to his wife's disappearance with the children was acute rage, evidenced by his abusive and threatening emails to both the mother and his father-in-law, who lives in Nigeria. *E.g.,* Pet. Exs. 1-6. It is evident from the emails that the father believed his father-in-law was financially and emotionally supporting the mother's desertion of the marriage and abduction of their children. Pet. Exs. 7, 13. The father-in-law is an obvious advocate for his daughter. At trial, the father admitted that he "hacked" into his father-in-law's email account, deleting some communications with the mother.

At trial, the father admitted he sent the threatening emails. He explained he was outraged and depressed by the unexpected loss of his family and especially by his wife's refusal to communicate with him. The court finds that the father's emails were inexcusably demeaning and threatening. Albeit, aggravated circumstances were involved: the sudden loss of his children and his wife's refusal to even inform him where their children were located. Given this situation, the father's bad behavior in sending emails to the mother and his father-in-law do not support a reasonable inference the father has a proclivity for violent or abusive behavior.

The father has not seen his daughter since the mother left England with her in May 2011. He has never had an opportunity to see his son. The mother terminated all contact with the father

4

on October 31, 2011. A preponderance of the credible evidence established the mother has unilaterally denied the father's parental and custody rights under English law.

The mother attempted to justify her conduct by claiming the father physically and mentally abused her while she lived with him in England. She related three instances of physical abuse, claiming two happened while she was pregnant and one purportedly took place in the presence of their daughter, then less than two years old. The father denied her accusations.

The court does not find credible or trustworthy the mother's testimony that she fled from England to the United States out of fear of her husband. The mother is a well-educated and well-spoken university graduate, and she worked as a banker in Nigeria before her marriage. During and after the claimed abuse, she was a divisional administrator for a charitable organization that assisted victims and witnesses of crime, including domestic violence, in England and Wales. She had regular and frequent contact with British law enforcement officers and social services agencies in the course of her work. Yet she never complained to a law enforcement officer or social services agency about mistreatment. This is astounding because she is a sophisticated person on abuse issues and victims' rights. She did not testify that she suffered any actual injury, nor did she seek medical treatment or counseling for the purported assaults. When the mother traveled to the United States with her young daughter, it was for the purpose of providing United States citizenship by giving birth in Denver. The agreed intent of the parents at the relevant time was that the mother would use the round trip tickets to return home as soon as she and the new baby could do so. She traveled on a tourist visa that was to expire in November 2011. She did not resign from her job until January 2012. Her elusive conduct after her son was born is far more revealing than her trial testimony.

The mother's demeanor in relating the three purported instances of violence was akin to testimony by an aggrieved spouse in an acrimonious divorce proceeding. The same may be said of the trial testimony of her own father. Although he never witnessed the father inflicting harm on the mother, the father-in-law testified that she told him about the husband's alleged abuse. The court does not find the father-in-law's testimony probative or reliable, given the lack of foundation and personal knowledge, as well as his close relationship with the mother. There was no reliable evidence proffered that these attacks happened. More importantly, there was no evidence that the father posed any threat whatsoever to the safety of his children.

An international child abduction in the context of a domestic dispute falls under the jurisdiction of the Hague Convention and ICARA. *Abbott v. Abbott*, 130 S. Ct. 1983, 1988 (2010) (citing the Hague Convention, art. 1). The Hague Convention was adopted to secure the prompt return of children either wrongfully removed to or retained in contracting states. *Id.* The United States and the United Kingdom are signatories to the Hague Convention; Nigeria is not.

The initial burden is on the father to establish, by a preponderance of the evidence, that his children have been wrongfully removed or retained within the meaning of the Hague Convention. 42 U.S.C. § 11603(e)(1)(A). To establish wrongful removal or retention, the father must show that his children were habitual residents of the United Kingdom immediately before the breach of his custody rights under English law, and that his custody rights were actually exercised, either jointly or alone, or would have been exercised were it not for the unlawful removal or retention of his children in the United States. Hague Convention, arts. 3-4. If he meets this burden, the mother may establish an exception to return of the children available under the Hague Convention. 42 U.S.C. § 11603(e)(2)(A)-(B).

6

### *Habitual Residence in the United Kingdom*

The Hague Convention does not define "habitual residence." This consideration is analyzed by application of the everyday meaning of the words. *Altamiranda Vale v. Avila*, 538 F.3d 581, 583 (7th Cir. 2008). Habitual residence may be established by the shared actions and intent of the parents, coupled with the passage of time. *Koch v. Koch*, 350 F.3d 703, 715 (7th Cir. 2006). The mother and father lived together in England during most of their marriage. The family's home is in England. Both parents were legal English residents and were employed in England. The mother did not resign from her job in England until January 2012, more than six months after traveling to the United States. The mother has an English drivers license reflecting the address of the couple's Bristol home. Pet. Ex. 9. Their daughter received medical care in Bristol. Pet. Ex. 11 (reflecting also the child's Bristol home address). She was enrolled in a local nursery school. Pet. Ex. 10. Overwhelming evidence has established that the daughter, like her parents, habitually resided in the United Kingdom.

The son was born in the United States. Due to his mother's unilateral decision to remain in the United States against the father's wishes, the son has not lived in England. Nonetheless, at the time of the son's birth, the established family home was in Bristol, England. The father consented to the son's birth in the United States with the joint understanding that his wife would return to England with their children within several months. He purchased round trip airline tickets. The parents' joint intent for the son to live with the family in England has been established by a preponderance of the evidence. The mother testified that she traveled to the United States for the express purpose of obtaining United States citizenship for the baby. This reason may have been a ruse, or she may have changed her own intentions after the baby's birth.

7

The mother's reluctance to return to England was not disclosed to the father until she was due to return, several months after the son was born. She did not deny that the family home was in England, and that she lived and worked in England during her marriage until May 11, 2011. The only reason the son has not actually resided in England was the mother's decision to retain the children in the United States.

Birth in the United States does not automatically render the son's habitual residence as the United States. *Kijowska v. Haines*, 463 F.3d 583, 587 (7th Cir. 2006) (Infant born in the United States did not acquire a United States habitual residence when the mother's habitual residence was in Sweden). A preponderance of the evidence established that the shared actions and intent of the parents before the son's birth was that he would reside in the family home in England. This is sufficient to show that the son's habitual residence was in the United Kingdom. The mother's argument that her son's habitual residence is in the United States lacks merit, given that his residence in the county since birth was due to her wrongful retention.

The mother's argument that the children's habitual residence is Nigeria lacks any legal or evidentiary support. While the parents are Nigerian citizens, they are legal residents of the United Kingdom, where they lived and worked before the son's birth, and where they were raising their daughter until she was unlawfully retained in the United States. Neither child has lived in Nigeria, nor was there any evidence proffered that the parents shared an intent to move the family to Nigeria.

### *Breach of Custody Rights*

The father's assertion of parental custody rights under English law was uncontested at trial. The mother and father have a joint parental responsibility for their minor children,

including the joint right to custody. Pet. Ex. 17.

### *Exercise of Custody Rights*

The evidence was uncontested that the father exercised his joint custody rights with respect to his daughter before she was wrongfully retained in the United States. The family lived together, he provided for his daughter, and the family engaged in regular outings. The father has never had contact with his son, who is an infant and is thousands of miles away due to the mother's wrongful conduct. The father repeatedly sought the return of his children and vigorously continues to do so through legal processes. The mother has frustrated the father's efforts to exercise his joint right to custody of his children. A preponderance of the evidence establishes that the father has taken every reasonable (and a few unreasonable) means to exercise his joint custody rights.

### *The Affirmative Defenses*

**Grave risk of harm.** The Hague Convention provides that abducted children should not be returned when the removing parent (here, the mother) shows that return of the children would place them in grave risk of physical or psychological harm, or any other "intolerable situation." Hague Convention, art. 13(b); *Abbott v. Abbott*, 130 S. Ct. 1983, 1997 (2010). Given the concern of comity among nations, this defense is interpreted narrowly. *Van De Sande v. Van De Sande*, 431 F.3d 567, 572 (7th Cir. 2005). The safety of children is paramount, but the risk of harm must "truly be grave." *Id.*; *Norinder v. Fuentes*, 657 F.3d 526, 535 (7th Cir. 2011). The mother must meet the demanding standard of clear and convincing evidence that a grave risk of harm exists. 42 U.S.C. § 11603(e)(2)(A). She has failed to do so.

The mother claims the children would be at a grave risk of harm because of the father's

capacity for violence. The record does not support her argument. The three contested acts of domestic violence she relies on were not credible, much less clear and convincing. She did not claim she suffered any resulting injuries. She never sought law enforcement intervention or complained to a social services agency, despite her work with victims of domestic abuse. Her testimony was implausible, and her father's testimony was based on hearsay.

In addition, the mother relies on the father's threatening language in emails *after* she abducted the children, as a predictor of his capacity for violence. The emails are evidence of bad judgment, a mean spirit, and anger control problems. But the emails must be considered in context. His wife had just abducted the children in a foreign country, for awhile he did not even know where she had taken them, his wife ignored his demand that she bring the children home, and his father-in-law appeared to be supporting her wrongful behavior. The threatening "get even" emails to his wife and father-in-law were not violent behavior, nor was his possibly illegal intrusion into his father-in-law's email account evidence of a grave risk of harm to the children. The father's anger was out of control and his brutish emails were inexcusable. However, this remote form of misbehavior was not clear and convincing evidence of a proclivity for actual violence. There was no evidence to suggest that he ever abused the children or that he presents a grave risk of harm to them.

**Unclean hands.** The mother argues that the father's petition should be denied on account of his bad conduct. She relies on evidence that the father intercepted her emails, which allowed him to know she had applied for asylum. The father then sent an email to her asylum attorney, threatening to expose (what he saw as) the fraudulent nature of his wife's asylum claim. The father sent a copy of this email to the Federal Bureau of Investigation. The mother testified that

10

the father also accessed her checkbook in England and used her funds. She again cited his admitted intrusion into his father-in-law's email account.

As an action under the Hague Convention is purely jurisdictional, it is not appropriate to consider the details of the parties' messy domestic disputes beyond their relevance to those defenses explicitly provided by the Hague Convention. Hague Convention, art. 19; 42 U.S.C. § 11601(b)(4). The Hague Convention does not recognize unclean hands as a defense. *Karpenko v. Leendertz*, 619 F.3d 259, 265 (3d Cir. 2010). The reasoning in *Karpenko* is instructive. The primary objectives of the Hague Convention – protecting the abducted child, restoring the pre-abduction status quo, ensuring comity amongst contracting states – would be undermined by considering an unclean hands defense to child abduction. *Id.*

**Protection of human rights and fundamental freedoms.** Article 20 provides that a court may refuse to grant a petition under the Hague Convention if the return of the child would violate the United States' principles of human rights and fundamental freedoms. This defense must be proven by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). The mother argues that Article 20 is applicable for two reasons: the risk of harm created by returning the children to their father, who she alleges is abusive; and the possibility that the mother returning to the United Kingdom with her children would threaten the mother's pending application for asylum in the United States.

Article 20 is rarely invoked. In fact, respondent concedes that this defense has *never* been asserted successfully in a published opinion in the United States. Here, there is no evidence that the children's human rights and fundamental freedoms would be in jeopardy in England in any way. As discussed above, there is no evidence that the father ever threatened to hurt the children.

11

Nor is there legal authority or evidence suggesting the children would not have adequate protection of their rights under the English legal and law enforcement systems. The mother's assertion of an Article 20 defense based on her asylum application is wholly without legal or logical support. The mother has failed to show why returning to England would jeopardize her asylum application (which, incidently, has already been preliminary denied). Pet. Ex. 19. Additionally, she has presented nothing to suggest that Article 20 applies to the protection of a parent's human rights and fundamental freedoms, as opposed to those the children.

**Consent or acquiescence.** Article 13 of the Hague Convention provides that an abducted child need not be returned if the complaining parent consented or subsequently acquiesced in the child's removal or retention in another country. These affirmative defenses must be proven by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B); *Baxter v. Baxter*, 423 F.3d 363, 368 (3d Cir. 2005).

The father only consented to his daughter traveling to the United States to accompany his wife for the agreed purpose of giving birth to their second child. He purchased round trip tickets. He demanded that the mother return the children to England when she first revealed she was "not in a hurry" to return. He forcefully and repeatedly reiterated his view that she did not have a right to retain the children in the United States. In asserting this defense, the mother relies on a single email, in which the father stated his exasperation over the situation to his father-in-law. He said he was finished with his wife, but his "children will remain his children" and his wife "can keep them for now." Resp. Ex. 9. This email sharply contrasts the father's consistent objections to his family remaining in the United States. He has been steadfast in his attempts to ensure their return, as evidenced by his conduct and his credible testimony at trial. A

12

preponderance of the evidence does not support the argument that the father either consented or acquiesced to the mother's wrongful retention of the children in the United States.

**Abandonment.** The Hague Convention does not recognize abandonment as an affirmative defense to child abduction. Moreover, the record does not factually support a conclusion that the father ever abandoned his children. Quite to the contrary, the record suggests that the mother abandoned her husband, home and legal residence in England. But that issue is for an English court to decide.

**Lack of jurisdiction.** The mother advanced a position that this court lacks jurisdiction because the parties are Nigerian and have only temporary residence permits in the United Kingdom. This groundless defense was not pursued at trial. The children are wrongfully retained in this judicial district. The court's jurisdiction for actions arising under the Hague Convention is set forth by ICARA at 42 U.S.C. §11603(a).

## Conclusion

The petition is granted for the return to the United Kingdom of the parties' children, identified as "O.U." born in 2009 and "N.U." born in 2011. Counsel for the parties shall meet within seven days of receipt of this order and confer about reasonable conditions and timing for the effectuation of this decision. By May 18, 2012, petitioner Chizoba Christopher Uzoh shall submit a proposed order effectuating this ruling. Respondent Chidinma Akachi Uzho shall file objections to the petitioner's proposed order or additional suggestions by May 28, 2012. A hearing is set on June 5, 2012 at 9:30 a.m. for entry of a final order implementing this decision.

The parties shall be prepared for prompt compliance with this decision, as required by the Hague Convention. The court shall release the children's passports in accordance with the

arrangements for their travel to the United Kingdom. The court will consider, but does not require, conditions with respect to the return order.

ENTER:

*Suzanne B. Conlon*
Suzanne B. Conlon
**UNITED STATES DISTRICT JUDGE**

May 2, 2012